Patrick CHAVIS, Andrew Ramsey, Mason Bryant, Rowland Allen, William Walker, Jr., and Marilyn Hotz, Plaintiffs,

v.

Edgar D. WHITCOMB, Governor of the State of Indiana, Defendant,
and
John C. Ruckelshaus, Otis R. Bryant, Jr., and Robert C. Morris, Intervening Defendants.

No. IP 69-C-23.

United States District Court
S. D. Indiana,
Indianapolis Division.

July 28, 1969.

James W. Beatty, Bamberger & Feibleman, James Manahan, Indianapolis, Ind., for plaintiffs.

Richard C. Johnson, Deputy Atty. Gen., Indianapolis, Ind., for defendant.

William K. Byrum, Fulmer, Burris & Byrum, Indianapolis, Ind., for intervening defendants.

Before KERNER, Circuit Judge, STECKLER, Chief District Judge, and NOLAND, District Judge.

## OPINION

By Judges KERNER, STECKLER, and NOLAND:

This suit was tried before a three-judge court of the Southern District of Indiana, constituted under 28 U.S.C. § 2281 in that the complaint prays that certain statutes of the State of Indiana, having state-wide effect,[1] be declared violative of the Constitution of the United States. Jurisdiction is predicated upon 28 U.S.C. § 1343. The complaint seeks declaratory relief pursuant to 28 U.S.C. § 2201 and injunctive relief would necessarily accompany a judgment adverse to defendants.

The action was commenced against the Indiana General Assembly and its individual members. By order of March 18, 1969, the Court granted the plaintiffs' motion to join Edgar D. Whitcomb, as Governor of the State of Indiana. By further order of May 12, 1969, the Court granted defendants' motion to dismiss as to the Indiana General Assembly and its individual members.

The complaint purports to state a class action; each plaintiff sues in his own behalf and in behalf of the class or classes he is alleged to represent. By order of June 18, 1969, the Court determined that this was not properly a class action but that the plaintiffs could maintain the action individually.[2] Also by order of June 18, 1969, the Court granted the petition of certain intervening defendants for leave to intervene nunc pro tunc June 12, 1969, pursuant to Rule 24(b)(2), Fed.R.Civ.P.

The parties agree that the bicameral Indiana General Assembly consists of a House of Representatives of one hundred members, and a Senate of fifty members,[3] elected from districts, and that under the Indiana Acts of 1965 (2d Spec.Sess.), ch. 5, sec. 3, p. 18 and ch. 4, sec. 3, p. 15,[4] Marion County Indiana, which includes the City of Indianapolis, comprises the Twenty-sixth District of the House and the Nineteenth District of the Senate. Under these statutes fifteen representatives and eight senators are apportioned to and elected at large from Marion County. The plain-

---

1. See this Court's Opinion and Order of June 18, 1969, 305 F.Supp. 1359 (S.D. Ind.1969).

2. See Court's separate Order of June 18, 1969, 305 F.Supp. 1359 (S.D.Ind.1969).

3. These numbers of legislators are the maximum permissible under the Constitution of the State of Indiana, Art. 4, sec. 2.

4. Otherwise published as Ind.Ann.Stat. §§ 34–102, 34–104, (Burns' Supp.1968).

tiffs assert that these statutes operate to violate their rights under the Equal Protection Clause of the Constitution of the United States.

## THE COMPLAINT

Each of the plaintiffs is described by the complaint; allegations of fact relating specifically to the individual plaintiffs are then made. Each plaintiff sues in his own behalf and in behalf of persons similarly situated.

Plaintiff Patrick Chavis is described as a resident and voter of Indiana. Though a Negro, he lives outside the 1960 and 1967 Ghetto Areas described in the complaint, residing in an area where Negroes are unlikely ever to gather in sufficient number to be able to exercise a voting bloc influence over the election of any candidate to any public office. Therefore, he alleges that he has an active interest in protecting the voting rights of the inhabitants of the described Ghetto Area whose interests and voting propensities approximate his own.

Plaintiffs Andrew Ramsey and Mason Bryant are described as Negro-Americans who are residents and voters of Marion County, Indiana, residing in the 1967 Ghetto Area described in the complaint. They are alleged to be part of a cognizable interest group which regularly engages in bloc voting but whose bloc voting is cancelled out by the voting of contrary interest groups in Marion County-wide elections. These plaintiffs allege that their vote is invidiously diluted in Indiana General Assembly elections by multi-member districting at large of General Assembly seats in Marion County.

Plaintiff Marilyn Hotz is described as a White-American, a resident of Marion County outside the City of Indianapolis, and a Republican by party preference. She alleges that persons living in Marion County outside the city include less than one-third of the population of Marion County but almost one-half of the regular Republican voters of the county. She further alleges that such residents are deprived of a proportionate voice as to who their Republican state legislators shall be, in years of Republican victory in Marion County.

Plaintiff Rowland Allen is described as an American citizen and a resident and voter of Marion County who is an independent voter. He alleges that he seeks to vote for the individual candidate rather than the political party, but that he is frustrated in this effort because of the large number of candidates presented by each party.

Plaintiff William Walker is described as a Negro resident and voter of Lake County, Indiana. He alleges that Lake County contains about the same number of Negroes as does Marion County but that Lake County Negroes have the opportunity to influence the election of only five-eighths as many senators and eleven-fifteenths as many representatives as do Marion County Negroes in General Assembly elections. He alleges that his vote is mathematically diluted because of the multi-member districting of Marion County.

In a separate paragraph of the complaint, the plaintiffs Chavis, Ramsey, and Bryant allege that the present legislative apportionment and districting statutes of Indiana are unconscionably detrimental to the force and effect of the vote of Negroes and poor persons living in Marion County. They further allege the existence of a geographical 1967 Ghetto Area having demographic characteristics which cause it to contain a cognizable minority interest group, and the existence of a Ghetto Voting Area whose boundaries closely coincide with those of the Ghetto Area. Because of its cognizable minority characteristics, the Ghetto Area is alleged to have an unusual interest in specific areas of substantive law.

The Ghetto Area is alleged to exist involuntarily because of the segregation of racial minority groups and persons of low income.

These plaintiffs claim that under single-member districting the two described Ghetto Areas would control the

nomination and election of three representatives and of one senator, but that these areas have almost no political force or control over legislators under the present districting scheme because the effect of their vote is cancelled out by other contrary interest groups in Marion County.

It is further alleged that the Democratic Party organization, particularly the County Chairman, has substantial control over the nomination of prospective state legislators in Marion County primary elections, through sponsorship of a slate of candidates. This slate is seldom defeated. Plaintiffs allege that this control exists because multi-member districting causes the number of candidates to be so large that they cannot become individually known to even the most conscientious and discerning voter.

Plaintiff William Walker, Jr. alleges that multi-member districting gives certain inhabitants and voters in a larger multi-member district a mathematically unconscionable advantage over him. He alleges that Lake County is second only to Marion County in number of inhabitants, that it is almost equal to Marion County in number of Negro inhabitants, and that if single-member districting prevailed in both counties, Lake County would elect as many "Negro rights-conscious" legislators to the General Assembly as would Marion County. Both counties are alleged to have a sufficient number of Negro voters and inhabitants for a bloc vote by said inhabitants to change the result of any election recently held.

He alleges that Lake County is a multi-member at large district for purposes of electing legislators, and that in the number of its inhabitants and of legislators Lake County is about three-fourths the size of Marion County. The four to three ratio of inhabitants and voters will continue to result in a four to three apportionment ratio of legislators between the two counties, but this four to three ratio on a multi-member district basis in Marion County will

result in an invidious dilution of the Lake County Negro and voter influence with respect to the General Assembly.

In support of his conclusion plaintiff Walker alleges that voter influence does not decrease in a direct inverse ratio with the population or voter population of a district because the rules of mathematics inject a square root factor into the denominator of the said equation and fraction. Because of this, the vote of each Lake County voter effects the election of only three-fourths as many legislators as the vote of each Marion County voter, but the probability of a typical Marion County voter's having an opportunity to effect the result of an individual legislator's conduct will not be an inverse three-fourths to that of the Lake County voter; rather it will be about 86.80% that of a Lake County voter.

Plaintiff Walker alleges that because of the square root factor it is mathematically impossible to achieve a truly equitable apportionment among multi-member legislative districts of different sizes. It is further alleged that there is competition between the Negro population of Lake County and the Negro population of Marion County to capitalize upon the general concern among the general public and its legislators to overcome injustices perpetrated upon racial minorities, and that Marion County Negroes enjoy an unconscionable advantage, diluting the voting power of Lake County Negroes.

In effect, the portions of the complaint relating specifically to plaintiffs Chavis, Ramsey, and Bryant allege that the result of electing Marion County's legislators at large is to dilute the vote of a cognizable minority group in violation of the Constitution of the United States.

All six plaintiffs seek a declaration that the at large provisions of the Indiana Acts of 1965 (2d Spec.Sess.) ch. 4, sec. 3, p. 15 and ch. 5, sec. 3, p. 18, are unconstitutional in so far as they apply to Marion County and an order directing a proper legislative apportionment in Marion County.

We find that those allegations of the complaint pertaining to a cognizable interest group consisting of Negroes residing in the "Center Township Ghetto" in Marion County, as that term and the area embraced are defined and delineated later in this opinion, have been proven by a preponderance of the evidence; that the election of legislators at large from Marion County effects an unjustifiable minimization of the voting power of this sizeable and cognizable minority group, and that members of the group, including the plaintiff Mason Bryant, have thus been invidiously discriminated against in contravention of the Equal Protection Clause of the United States Constitution. The remedy which we believe to be appropriate at this time is stated *infra*.

### THE TEST TO BE APPLIED

Plaintiffs rely somewhat on dictum of Lucas v. Forty-Fourth Colorado General Assembly, 377 U.S. 713, 731, 84 S. Ct. 1459, 1471, 12 L.Ed.2d 632 (1964), discussing possible undesirable features of multi-member districting. However, that decision is inapposite in that it did not intimate that such districts are constitutionally defective. See Footnote 21 to *Lucas*.

The first case to come before the Supreme Court specifically raising an issue of the constitutionality of a multi-member districting scheme was Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). There, under Georgia's 1962 Senatorial Reapportionment Act the state was divided into senatorial districts that were conceded to be substantially equal in population. Except for the seven most populous counties in the state, from one to eight counties comprised a district and the voters therein, on a district-wide basis, elected the senator for that district. The seven most populous counties were divided into from two to seven districts each and the voters in each such county, instead of electing only one senator from the district in which they resided, elected, on a county-wide basis,

the number of senators that the county had districts. The plaintiffs, registered voters in multi-district counties, brought action in the Federal District Court seeking a decree that the county-wide voting requirement in the seven multi-district counties violated the Equal Protection Clause of the Fourteenth Amendment. The three-judge District Court granted their motion for summary judgment, holding that the difference between electing senators in districts comprising a county or group of counties and in multi-district counties constituted an "invidious discrimination tested by any standard." Dorsey v. Fortson, 228 F.Supp. 259 at 263 (N.D.Ga.1964). The Supreme Court reversed, holding that a multi-member legislative district was not per se violative of equal protection rights; the intended scope of the Court's decision appears clear from the following:

> "Agreeing with appellees' contention that the multi-member constituency feature of the Georgia scheme was *per se* bad, the District Court entered the decree on summary judgment. We treat the question as presented in that context, and our opinion is not to be understood to say that in all instances or under all circumstances such a system as Georgia has will comport with the dictates of the Equal Protection Clause. It might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated it will be time enough to consider whether the system still passes constitutional muster. This question, however, is not presented by the record before us." Fortson v. Dorsey, *supra*, at 439, 85 S.Ct. at 501.

The Court in *Fortson* did not decide that a multi-member districting scheme, even though operating to cancel out the voting strength of an element of the

population, would be unconstitutional as discriminatory, preferring to withhold that determination in the absence of any support in the record.

In Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), the use of multi-member districts was one attack made on the .Hawaii legislative apportionment and districting statutes. As in *Fortson*, the Court held that sufficient proof had not been adduced to show discrimination:

> "But the demonstration that a particular multi-member scheme effects an invidious result must appear from evidence in the record. Cf. McGowan v. [State of] Maryland, 366 U.S. 420, [81 S.Ct. 1101, 6 L.Ed.2d 393]. That demonstration was not made here. In relying on conjecture as to the effects of multi-member districting rather than demonstrated fact, the court acted in a manner more appropriate to the body responsible for drawing up the districting plan. Speculations do not supply evidence that the multi-member districting was designed to have or had the invidious effect necessary to a judgment of the unconstitutionality of the districting." 384 U.S. 73, 86 S.Ct. 1286.

Clarifying the earlier language in *Fortson*, however, the Court made it clear that under some circumstances multi-member districting could be violative of the Constitution. The Court in *Burns* characterized the language of *Fortson* as the applicable standard of constitutionality:

> "Where the requirements of Reynolds v. Sims are met, *apportionment schemes including multi-member districts will constitute an invidious discrimination only if it can be shown* that 'designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a

particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population.' *Id.* (Fortson v. Dorsey) at 439 [85 S.Ct. 498, at 501]." [Emphasis added.]

*Burns* further specified the standard by pointing out the facts in *Fortson* which had argued against a showing of minimization or cancellation of voting strength. The Court stated:

> "It may be that this invidious effect can more easily be shown if, in contrast to the facts in *Fortson*, districts are large in relation to the total number of legislators, if districts are not appropriately subdistricted to assure distribution of legislators that are resident over the entire district, or if such districts characterize both houses of a bicameral legislature rather than one." 384 U.S. 73, 86 S.Ct. 1286.

■ The teaching of *Fortson* and *Burns* is that inherent discrimination is not apparent on the face of any multi-member districting scheme, under the Equal Protection Clause. Choosing between specific single-member legislative districts and multi-member districts is essentially a choice between political theories of representational democracy.[5] That decision, once made by the state legislature, which all agree is the body primarily responsible for political decisions, is to be disturbed by the judiciary only upon specific proof that the adopted scheme of districting is actually functioning in a manner that minimizes or cancels out the voting strength of a cognizable racial or political element of the voting population. It is largely beyond concern whether this effect occurs "designedly, or otherwise." Fortson v. Dorsey, 379 U.S. 433 at 439, 85 S.Ct. 498, 13 L.Ed.2d 401.[6]

5. See Burns v. Richardson, 384 U.S. 73, at 89 n. 15, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

6. In the term following that of Burns, the Supreme Court stated that "our cases do not foreclose attempts to show that in the particular circumstances of a given case multi-member districts are invidiously discriminatory." Kilgarlin v. Hill, 386 U.S. 120, at 125, n. 3, 87 S.Ct. 820, at 823, 17 L.Ed.2d 771 (1967).

Defendants have raised the decisions in Stout v. Bottorff, 246 F.Supp. 825 (S.D.Ind.1965) and 249 F.Supp. 488 (S.D.Ind.1965), as a bar to relief for the plaintiffs in this action; hence it is necessary to examine the principles of those cases.[7]

The main thrust of the first reported opinion was the decision that "special joint districts" or "floterial districts" were unconstitutional as resulting in dilution of the voting strength of voters resident in less populous counties joined with more populous counties in a floterial district; however, the issue of the constitutionality of multi-member districts was also raised. The Court stated:

> "We have been shown no evidence in these records of any discrimination, purposeful or otherwise, against any group of voters in the at-large election system in Marion County, and in the absence of such a showing, Grills (one of the plaintiffs in Stout) is not entitled to any relief on the basis of this claim. Fortson v. Dorsey, 379 U.S. 433, 438–439, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965); Reynolds v. Sims, 377 U.S. 533 at 577, 84 S.Ct. 1362, 12 L.Ed.2d 506." Stout v. Bottorff, supra, at 829. [Parenthetical matter added.]

The decision in Stout that sufficient proof to warrant the ordering of single-member districting was not adduced is not res judicata for a decision in a later case involving different proof.

The second reported decision, 249 F. Supp. 488 (S.D.Ind.1965), held one house apportionment plan and one senate apportionment plan constitutional under the then prevailing standards of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). These are the apportionment and districting provisions of the statutes presently under attack. The question whether the voting strength of citizens is diluted or minimized by apportionment and districting statutes, whether tested under Reynolds v. Sims, or Burns v. Richardson, is not one which is easily accommodated by classical concepts of res judicata or of stare decisis. The population of Indiana and the United States is highly mobile; an apportionment scheme found to meet constitutional scrutiny on a previous date may no longer do so. Reliable demographic data becomes newly available. The apportionment plans approved in the second Stout case were based on voter population, not on total census figures. Additionally, the standard properly applicable to a pure apportionment issue, as presented in Stout, has been clarified and narrowed since Stout v. Bottorff was decided. Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969).

## WHAT THE EVIDENCE SHOWS

The Indiana General Assembly is a bicameral legislature consisting of a House of Representatives of one hundred members and a Senate of fifty members. These numbers of legislators are the maximum permissible under the Constitution of the State of Indiana, Art. 4, Sec. 2. Under the present apportionment and districting statutes, Acts of 1965 (2d Spec.Sess.) ch. 5, sec. 3, p. 18, and ch. 4, sec. 3, p. 15, fifteen representatives and eight senators are elected at large from Marion County, Indiana, under a multi-member districting apportionment scheme.

Under the present districting and apportionment scheme for Indiana, twenty-seven Indiana senators are elected from eight multi-member senate districts, the remainder being elected from single-member districts. Eighty-six representatives are elected from twenty-five multi-member house districts, the remainder from single-member districts.

---

7. For an excellent chronology of the four fundamental phases of the Stout litigation, and an authoritative historical account of legislative apportionment in In- diana generally, see Wallace, Legislative Apportionment in Indiana: A Case History, 42 Ind.L.J. 6 (1966).

Marion County contains nine townships, and each township is subdivided, for census purposes, into the 1960 Census Tracts as shown on the following map:

# 1960 CENSUS TRACTS
# MARION COUNTY, INDIANA

METROPOLITAN PLANNING DEPARTMENT

| Census Tract Series | Township |
|---|---|
| 100 | Pike |
| 200 | Washington |
| 300 | Lawrence |
| 400 | Wayne |
| 500 | Center |
| 600 | Warren |
| 700 | Decatur |
| 800 | Perry |
| 900 | Franklin |

*The Cognizable Racial Element*

Because the resolution of this case depends, in large part, on identifying an injured minority group residing in a modern "ghetto," the Court has analyzed the meaning of the word.[8] After considering the dictionary definitions of "ghetto," examining pertinent demographic determinants, and considering the Report of the National Advisory Commission on Civil Disorders, the Court adopts the following updated definition of the word "ghetto" for purposes of this case:

> Ghetto—A primarily residential section of an urban area characterized by a higher relative density of population and a higher relative proportion of substandard housing than in the overall metropolitan area which is inhabited predominantly by members of a racial, ethnic, or other minority group, most of whom are of lower socioeconomic status than the prevailing status in the metropolitan area and whose residence in the section is often the result of social, legal, or economic restrictions or custom.

The cognizable group whose voting strength is minimized and rendered ineffective resides in an area which the Court denominates the Center Township Ghetto which consists of 1960 Census Tracts 501–520, 528–531, 534–536, 540, those portions of 521–523 which are north of Massachusetts Avenue, and those portions of 537 which are north and east of White River. The analysis of this area using PX 2, DX A9, and DX O, shows it to have an approximate 1967 population of 97,000 non-whites, of whom approximately 99.8% are Negro, and 35,000 whites.

The following Table No. 1, prepared by the Court from evidence introduced by the defendant, shows selected *Housing Characteristics* for the following Census Tracts:

| Tract | Comment |
| --- | --- |
| 211 | A relatively wealthy suburban area chosen for contrast and in which plaintiff Chavis resides. |
| 220 | The only tract which is within the "1960 Ghetto Area," "1967 Ghetto Area," and "1967 Ghetto Voting Area," (as these areas are defined in the complaint), which is outside Center Township, other than a small portion of the "1967 Ghetto Voting Area" which extends into Warren Township. |
| 507 | A randomly selected tract which is representative of the middle-class tracts which were not within the "1960 Ghetto Area," but are within the "1967 Ghetto |

---

8. The following definitions of the word "ghetto" are contained in the sources cited:

a) ghetto—a quarter of a city in which Jews are required to live; broadly: a quarter of a city in which members of a minority group live because of social, legal or economic pressure. [Webster's 7th New Collegiate Dictionary (based on Webster's New 3d International) (1967).]

b) ghetto—1. A section of a city in which, in former times in most European countries, all Jews were required to live. 2. A section predominantly inhabited by Jews. 3. U.S. A section of a city, esp. a thickly populated slum area, inhabited predominantly by Negroes, Puerto Ricans, or any other minority group, often as a result of social or economic restrictions. [Random House Dictionary (1968).]

c) The term "ghetto" as used in this report refers to an area within a city characterized by poverty and acute social disorganization, and inhabited by members of a racial or ethnic group under conditions of involuntary segregation. [National Advisory Commission on Civil Disorders, Report at 6 n. 1 (U.S.G.P.O.1968).]

Area" and "1967 Ghetto Voting Area" (as these areas are defined in the complaint), which were largely integrated after 1960 (see DX A9 and DX O). It was chosen from among Tracts 504, 505, 506, 507, 509, 521, 522, and 523.

537    A ghetto tract which, like 507, was added to the "Ghetto Areas" of 1967, but which was occupied predominantly by whites of lower economic status prior to a rapidly increasing influx of similarly situated non-whites after 1960 (see DX A9 and DX O).

It is the only tract of this nature.[9]

511,)   These tracts are within all the
517,)   "Ghetto Areas" referred to in
530,)   the complaint and were random-
535,)   ly selected as representative of
and)   the predominantly non-white
540)   portion of the ghetto area of Center Township.

563    This tract was randomly selected to typify tracts outside the "Ghetto Areas" referred to in the complaint but which are within the predominantly white ghetto portion of Center Township.

---

**9.** The uncapitalized word "ghetto" used in *Comment* above is used as heretofore defined.

TABLE NO. 1

HOUSING CHARACTERISTICS

| Census Tract | 1 Non-White Population % 1960 | 2 1967 | 3 Non-White Dwelling Units % Range 1960 | 4 Crowded Dwelling Units Quintile 1960 | 5 Owner-Occupied Dwellings % Range 1960 | 6 Housing Units Built Prior to 1940 % Range | 7 Housing Condition Dilapi-dated % Range 1960 | Dilapi-dated and Deterio-rated % Range 1960 |
|---|---|---|---|---|---|---|---|---|
| 211 | 3 | 10 | 0 - 10 | 1 | 80 - 100 | 10 - 25 | 0 - 2 | 2 - 10 |
| 220 | 76 | 80 | 50 - 75 | 2 | 60 - 79 | 75 - 90 | 0 - 2 | 2 - 10 |
| 507 | 13 | 60 | 10 - 25 | 4 | 80 - 100 | 25 - 50 | 0 - 2 | 2 - 10 |
| 537 | 37 | 85 | 25 - 50 | 5 | 40 - 59 | 75 - 90 | 0 - 2 | 21 - 30 |
| 511 | 94 | 94 | 75 - 90 | 4 | 60 - 79 | 75 - 90 | 2 - 10 | 11 - 20 |
| 517 | 56 | 75 | 25 - 50 | 5 | 20 - 39 | 90 - 100 | 2 - 10 | 31 - 40 |
| 530 | 43 | 43 | 25 - 50 | 5 | 40 - 59 | 90 - 100 | 2 - 10 | 31 - 40 |
| 535 | 99 | 99 | 90 - 100 | 5 | 20 - 39 | 75 - 90 | 0 - 2 | 31 - 40 |
| 540 | 98 | 98 | 75 - 90 | 5 | 20 - 39 | 90 - 100 | 11- 20 | 51 - 60 |
| 563 | 15 | 13 | 0 - 10 | 3 | 0 - 20 | 75 - 90 | 21 -30 | 51 - 100 |

(For brevity the letters PX refer to Plaintiffs' Exhibit and the letters DX refer to Defendant's Exhibit.)

Sources:

Column 1 - PX 2, DX A9.

Column 2 - DX A9 (Figures for Tracts 211 and 563 were estimated by extrapolation from sources on mobility.)

Column 3 - DX A12.

Column 4 - DX A8.  Percent of dwelling units with more than one person per room.

Quintile 1    0.00 to 5.30%
Quintile 2    5.30 to 9.10%
Quintile 3    9.10 to 13.20%
Quintile 4   13.20 to 18.15%
Quintile 5   18.15 to 30.65%

Column 5 - DX A11.

Column 6 - DX A3.

Column 7 - DX A18.

Column 8 - DX A17.

The following Table No. 2, prepared by the Court from evidence introduced by the defendant, shows selected *Social Characteristics* for the same census tracts used for the *Housing Characteristics* in Table No. 1:

TABLE NO. 2

SOCIAL CHARACTERISTICS

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| | | | Recipients of Old Age Assistance 1960 | | High School | Juvenile Delinquency Cases 1960 | | Unemployment Rate |
| | Non-White Population % | | | Rate | Graduates | Num- | Rate | 1960 |
| Census Tract | 1960 | 1967 | Per-sons | per 1,000 | Quintile 1960 | ber of Cases | per 1,000 | % Range |
| 211 | 3 | 10 | 5 | 1.43 | 1 | 2 | 0.57 | 0 - 2 |
| 220 | 76 | 80 | 15 | 3.06 | 2 | 11 | 2.25 | 4 - 6 |
| 507 | 13 | 60 | 5 | 1.67 | 3 | 8 | 2.67 | 2 - 4 |
| 537 | 37 | 85 | 10 | 8.33 | 5 | 6 | 5.00 | 8+ |
| 511 | 94 | 94 | 30 | 4.69 | 4 | 19 | 2.97 | 6 - 8 |
| 517 | 56 | 75 | 60 | 6.25 | 4 | 61 | 6.35 | 8+ |
| 530 | 43 | 43 | 40 | 11.76 | 5 | 36 | 10.59 | 8+ |
| 535 | 99 | 99 | 185 | 24.67 | 5 | 59 | 7.87 | 8+ |
| 540 | 98 | 98 | 155 | 40.79 | 5 | 39 | 10.26 | 2 - 8+ |
| 563 | 15 | 13 | 40 | 26.67 | 5 | 14 | 9.33 | 4 - 6 |

Sources:

Column 1 - PX 2, DX A9.

Column 2 - DX A9 (Figures for Tracts 211 and 563 were estimated by extrapolation from sources on mobility.)

Column 3 - DX 6  (Counted from the exhibit by the Court.)

Column 4 - PX 2, DX 6 (Rate calculated by the Court.)

Column 5 - DX A24 (Persons 25 years old and over having completed high school.)
Qunitile 1 - 65.7 - 89.5%
Quintile 2 - 51.3 - 64.9%
Quintile 3 - 39.3 - 51.1%
Quintile 4 - 27.0 - 38.8%
Quintile 5 -  8.8 - 25.7%

Column 6 - DX A23 (Counted from the exhibit by the Court.)

Column 7 - PX 2, DX A23 (Rate calculated by the Court.)

Column 8 - DX A22 (By comparison with DX A1.)

The following Table No. 3, prepared by the Court from evidence introduced by the defendant, shows selected *Economic Characteristics* for the same census tracts used for the *Housing Characteristics* Table No. 1.

TABLE NO. 3

ECONOMIC CHARACTERISTICS

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| | Non-White Population % | | Median Family Income | | | | Automobile Ownership |
| | | | 1959 | 1967 | | 1985 | 1985 |
| Census Tract | 1960 | 1967 | Range in Thousands | All | Non-White | Range in Thousands | Automobiles Per Family |
| 211 | 3 | 10 | 10+ | 10,000+ | 10,000+ | 15,000+ | 1.75+ |
| 220 | 76 | 80 | 6 - 7 | 8,200 | 7,890 | 11-13,000 | 1 - 1.50 |
| 507 | 13 | 60 | 6 - 7 | 8,015 | 6,500 | 0-11,000 | 1 - 1.50 |
| 537 | 37 | 85 | 4 - 5 | 5,608 | 5,000 | 0-11,000 | 0 - 1 |
| 511 | 94 | 94 | 5 - 6 | 7,082 | 7,069 | 0-11,000 | 0 - 1 |
| 517 | 56 | 75 | 4 - 5 | 5,485 | 4,937 | 0-11,000 | 0 - 1 |
| 530 | 43 | 43 | 4 - 5 | 5,890 | 5,334 | 0-11,000 | 0 - 1 |
| 535 | 99 | 99 | 0 - 4 | 4,386 | 4,400 | 0-11,000 | 0 - 1 |
| 540 | 98 | 98 | 0 - 4 | 4,175 | 4,190 | 0-11,000 | 0 - 1 |
| 563 | 15 | 13 | 0 - 4 | 6,000 | 6,000 | * | 0 - 1 |

Sources:

Column 1 - PX 2, DX A9.

Column 2 - DX A9 (Figures for Tracts 211 and 563 were estimated by extrapolation from sources on mobility.)

Column 3 - DX A4.

(Column 4
(                  - DX A9 p. 2 and estimates for Tracts 211 and 563 based on
(Column 5      DX Q pp. 23-24.

Column 6 - DX Q p. 24 (By comparison with DX A1).

       * The estimate for Tract 563 is 11 - 13,000, but this is based upon the assumption that new middle-class housing will replace existing housing presently occupied by predominantly white persons of low economic status.   See DX Q p. 23.

Column 7 - DX Q p. 35 (By comparison with DX A1).

[A755]

The following Table No. 4, prepared by the Court from the evidence in Tables No. 1 through 3, shows selected *Critical Differentiating Characteristics* of certain representative census tracts:

TABLE NO. 4

CRITICAL DIFFERENTIATING CHARACTERISTICS

| Census Tract | Non-White Population % 1960 | 1967 | Owner-Occupied Dwelling Units % Range 1960 | Crowded Dwelling Units Quintile 1960 | Housing Condition Deteriorated and Dilapidated % Range 1960 | Old Age Assistance Recipients Rate per 1,000 1960 | High School Graduates Quintile 1960 | Juvenile Delinquency Cases Rate per 1,000 1960 | Unemployment Rate % Range 1960 | Range in $1,000 1959 | All 1967 | Non-White 1967 | Range in Dollars 1985 | Automobile Ownership Automobiles per Family 1985 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 220 | 76 | 80 | 60 - 79 | 2 | 2 - 10 | 3.06 | 2 | 2.25 | 4 - 6 | 6 - 7 | 8,200 | 7,890 | 11-13,000 | 1 - 1.50 |
| 507 | 13 | 60 | 80 - 100 | 4 | 2 - 10 | 1.67 | 3 | 2.67 | 2 - 4 | 6 - 7 | 8,015 | 6,500 | 0-11,000 | 1 - 1.50 |
| 537 | 37 | 85 | 40 - 59 | 5 | 21 - 30 | 8.33 | 5 | 5.00 | 8+ | 4 - 5 | 5,608 | 5,000 | 0-11,000 | 0 - 1 |
| 511 | 94 | 94 | 60 - 70 | 4 | 11 - 20 | 4.69 | 4 | 2.97 | 6 - 8 | 5 - 6 | 7,082 | 7,069 | 0-11,000 | 0 - 1 |
| 517 | 56 | 75 | 20 - 39 | 5 | 31 - 50 | 6.25 | 4 | 6.35 | 8+ | 4 - 5 | 5,485 | 4,937 | 0-11,000 | 0 - 1 |
| 530 | 43 | 43 | 40 - 59 | 5 | 31 - 40 | 11.76 | 5 | 10.59 | 8+ | 4 - 5 | 5,898 | 3,334 | 0-11,000 | 0 - 1 |
| 535 | 99 | 99 | 20 - 39 | 5 | 31 - 40 | 24.67 | 5 | 7.87 | 8+ | 0 - 4 | 4,386 | 4,400 | 0-11,000 | 0 - 1 |
| 540 | 98 | 98 | 20 - 39 | 5 | 51 - 60 | 40.79 | 5 | 10.26 | 2 - 8+ | 0 - 4 | 4,175 | 4,190 | 0-11,000 | 0 - 1 |

Sources:

Column 1 - Table No. 1, Housing Characteristics    Col. 1
Column 2 - Table No. 1, Housing Characteristics    Col. 2
Column 3 - Table No. 1, Housing Characteristics    Col. 5
Column 4 - Table No. 1, Housing Characteristics    Col. 4
Column 5 - Table No. 1, Housing Characteristics    Col. 8
Column 6 - Table No. 2, Social Characteristics    Col. 4
Column 7 - Table No. 2, Social Characteristics    Col. 5
Column 8 - Table No. 2, Social Characteristics    Col. 7
Column 9 - Table No. 2, Social Characteristics    Col. 8
Column 10 - Table No. 3, Economic Characteristics    Col. 3
Column 11 - Table No. 3, Economic Characteristics    Col. 6
Column 12 - Table No. 3, Economic Characteristics    Col. 5
Column 13 - Table No. 3, Economic Characteristics    Col. 6
Column 14 - Table No. 3, Economic Characteristics    Col. 7

[A756J

Due to significant differences between Census Tract 220 and the remainder of the Marion County "Ghetto Areas" alleged in the complaint, we find that there has been a failure of proof which would justify the inclusion of Tract 220 in the Ghetto. We find that the difference in income, the relative absence of crowded and deteriorated housing,[10] the higher educational level, and the lower rates of welfare assistance, juvenile crime and unemployment, strongly distinguish Tract 220 from the Ghetto. Because of the higher economic status of its residents and their substantially better housing conditions, Tract 220 does not meet our definition of ghetto.

While Census Tract 220 is inhabited predominantly by Negroes, and its housing is generally as old as that of most parts of the Ghetto, it is primarily a middle-class area, lying just north of 38th Street. It is wholly within Washington Township which was, until recently, a white suburban area except for Tract 220.

Prior to 1950, there was a small Washington Township Negro community in the area bounded by 38th Street on the south, Graceland Avenue on the east, 42d Street on the North, and Clarendon Place on the west. It was completely isolated from the Negro communities of Center Township, the closest such community being the Ghetto's northern portion running south from 30th Street, eight blocks away. It was the only Negro area in Washington Township. The Negro residents of the area, then as now, were of middle-class status.

While the *Housing, Social,* and *Economic Characteristics* Tables (Tables Nos. 1, 2, and 3) show that Tract 220 is clearly not an upper socioeconomic class area like Tract 211, the *Critical Differentiating Characteristics* Table (Table No. 4) shows that Tract 220 differs significantly from the remainder of what plaintiffs have denominated the "1960

Ghetto Area" and the "1967 Ghetto Area" which is coterminous with their "1967 Ghetto Voting Area."

With due allowance made for Tract 507, which was not significantly integrated until after 1960 and which was never a portion of the predominantly white ghetto (compare Tract 507 with Tracts 537 and 563), Tract 220 is easily differentiated from the rest of plaintiffs' "Ghetto Areas." The *Critical Differentiating Characteristics* Table features many of the salient factors which characterize a ghetto. Column 3 shows that out of the six hard core ghetto Tracts (511, 517, 530, 535, 537, and 540), only Tract 511 does not have a greater percentage of absentee landlords and/or owners than Tract 220. Column 5 shows that housing in all the hard core Tracts was in substantially worse condition than in Tract 220. Column 6 shows that the number of old age assistance recipients in the hard core Tracts ranged from one and one-half to fifteen times as many as were in Tract 220. Column 9 shows that the unemployment rate in the hard core Tracts (except for one-quarter of Tract 540) exceeded 6% and in five of the six Tracts exceeded 8%, while that in Tract 220 was less than 6%. The 1959 median family income of Tract 220, in Column 10, exceeded the same income for the hard core Tracts. That the difference is expected to continue is evidenced by Column 14 which shows that, even as far in the future as 1985, it is estimated that an average family in Tract 220 will own more than one automobile while an average family in the hard core Tracts will own less than one automobile.

Including Tract 507 in the Ghetto, several important distinctions remain which show that Tract 220 is not properly a part of the Ghetto. Column 4 shows that while the percentage of crowded dwelling units in Tract 220 ranges from

10. The housing deficiency patterns shown in DX B–E have also significantly in-

fluenced our determination of this question.

5.3 to 9.1%, the percentage in the Ghetto ranges from 13.2 to 30.65%. Column 7 shows that more than half of the residents of Tract 220 over age twenty-four have completed high school, while less than half of those in the Ghetto have done so; in fact, in some areas, less than 10%. The juvenile crime rate in Tract 220 is lower than that of the Ghetto Tracts in Column 8. The median family income characteristics in Columns 11, 12, and 13 all show Tract 220 to be middle-class in nature, while the Ghetto Tracts are distinctly shown to be in a lower economic class. One of the most crucial statistics, in this regard, is the one in Column 12 which shows that Negro family median income in Tract 507 (which was 60% Negro in 1967) is $569 less than Tract 511 (a hard core Tract with 94% Negro population) and $1,390 less than Tract 220 (80% Negro). The importance of this comparison cannot be overstated. While the non-white population of Tract 220 went from 76% to 80% from 1960 to 1967, its income range remained high (comparing 1959 with 1967) for whites and non-whites. However, Tract 507 showed a non-white population change of 13% and its 1959 income parity with Tract 220 ended. Thus it is clear that the 1960-67 influx of Negroes into Tract 507 (see Columns 1 and 2) consisted of Negro families of significantly lower economic class than those resident in Tract 220. That this difference is expected to continue is shown by Column 13 which places Tract 507 in the Ghetto with an estimated 1985 median family income less than $11,000, while that of Tract 220 is estimated at $11-13,000.

The statistical differences between Tract 220 and the Ghetto can also be expressed in more personal terms. Each of the statistical differences represents compelling interests in such legislative areas as urban renewal and rehabilita-tion, health care, employment training and opportunities, welfare, and relief of the poor, law enforcement, quality of education, and anti-discrimination measures.

We believe that the minority group voting strength minimization discussed in Fortson v. Dorsey and Burns v. Richardson, is, in this case, best expressed in terms of the compelling interests which we find present in the Ghetto and absent in Tract 220. These interests are in addition to those common to Tract 220, the Ghetto, and the rest of Marion County in such areas as metropolitan transportation, flood control, sewage disposal, and education.

There has also been a failure of proof as to that portion of the "1967 Ghetto Voting Area" and "1967 Ghetto Area" in Warren Township. This portion is bounded by Arlington Avenue on the west, Massachusetts Avenue (also Pendleton Pike) on the south, Sheridan Avenue on the east, and 38th Street on the north. Except for the relatively recent movement of Negroes into that area, there is an absence of evidence in the record that this area in any way resembles the Ghetto. Not even the evidence introduced by defendant as to Census Tracts 601 and 602, of which the questioned area is part, offer any aid to plaintiffs in this regard. Accordingly, we find that this area is not part of the Ghetto.

Excluding Tract 220 and the Warren Township area, we find that the remaining area alleged by plaintiffs is within the Center Township Ghetto.[11] Accordingly, we find that the Center Township Ghetto consists of 1960 Census Tracts 501-520, 528-531, 534-536, 540, and those portions of 521-523 which are north of Massachusetts Avenue and of 537 which are north and east of White River. This does not represent the entire ghettoized portion of Center Town-

11. Our analysis of the Center Township Ghetto, using PX 2, DX A-9, and DX O, shows it to have an approximate 1967 population of 132,000, of which approxi-mately 35,000 are white and 97,000 are non-white. Approximately 99.8% of the non-white population is Negro.

ship but only the portion which is predominantly inhabited by Negroes and which was alleged in the complaint. See map.

1960 CENSUS TRACTS
MARION COUNTY, INDIANA

METROPOLITAN PLANNING DEPARTMENT
MARION COUNTY, INDIANA
ROOM 2346 – CITY COUNTY BUILDING – INDIANAPOLIS

### Representational Inequities

Marion County legislators have consistently resided in Washington Township in numbers far disproportionately to Washington Township's percentage of the population of Marion County. The residences of Marion County legislators have not been distributed throughout the county in relation to the population density of various geographical areas of the county.

The following Table No. 5, prepared by the Court from the evidence, shows

the number of senators elected from Marion County, Center Township, and Washington Township for the period 1960 through 1969:

TABLE NO. 5

|  | 1960 | 1962 | 1964 | 1966 | 1968 | Total |
|---|---|---|---|---|---|---|
| Marion County | 5 | 1 | 6 | 2 | 7 | 21 |
| Center Twp. | 0 | 0 | 2 | 0 | 0 | 2 |
| Washington Twp. | 4 | 1 | 2 | 1 | 3 | 11 |

Source: PX 5A-E

The following Table No. 6, prepared by the Court from the evidence shows the number of representatives elected from Marion County, Center Township, and Washington Township for the period 1960 through 1969:

TABLE NO. 6

|  | 1960 | 1962 | 1964 | 1966 | 1968 | Total |
|---|---|---|---|---|---|---|
| Marion County | 12 | 12 | 15 | 15 | 15 | 67 |
| Center Twp. | 0 | 4 | 5 | 1 | 2 | 12 |
| Washington Twp. | 7 | 2 | 7 | 6 | 6 | 28 |

Source: PX 6A-E

The following Table No. 7, prepared by the Court from the evidence, shows the number and percentage of senators and representatives elected during the period 1960–1968, according to their residence within 11 areas of Marion County.

TABLE NO. 7

| RESIDENCE OF LEGISLATORS (BY MARION COUNTY AREA) | 1960-69 AVERAGE POPULATION | 1960-69 AVE. POP. AS PERCENTAGE OF MARION COUNTY AVERAGE POP. 1960 | SENATORS ELECTED | | | | | | SENATORS ELECTED AS PERCENT OF 1960-68 TOTAL | REPRESENTATIVES ELECTED | | | | | | REPRESENTATIVES ELECTED AS PERCENT OF 1960-68 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1960 | 1962 | 1964 | 1966 | 1968 | 1960-1968 | 1960-68 TOTAL | 1960 | 1962 | 1964 | 1966 | 1968 | 1960-1968 | 1960-68 TOTAL |
| | | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| WASHINGTON TWP. EXCLUDING TRACT 220 | 103,615 | 13.98 | 3 | 1 | 2 | 1 | 3 | 10 | 47.52 | 6 | 2 | 5 | 5 | 5 | 23 | 34.33 |
| CENSUS TRACT 220 | 4,866 | 0.66 | 1 | 0 | 0 | 0 | 0 | 1 | 4.75 | 1 | 0 | 2 | 1 | 1 | 5 | 7.46 |
| CENTER TWP. EXCLUDING GHETTO | 172,876 | 23.32 | 0 | 0 | 1 | 0 | 0 | 1 | 4.75 | 0 | 3 | 4 | 1 | 0. | 8 | 11.94 |
| CENTER TWP. GHETTO | 132,000 | 17.81 | 0 | 0 | 1 | 0 | 0 | 1 | 4.75 | 0 | 1 | 1 | 0 | 2 | 4 | 5.97 |
| PIKE TWP. | 11,031 | 1.49 | 0 | 0 | 0 | 0 | 0 | 0 | -0- | 0 | 0 | 0 | 0 | 1 | 1 | 1.49 |
| WAYNE TWP. | 105,961 | 14.30 | 0 | 0 | 0 | 0 | 0 | 0 | -0- | 1 | 2 | 0 | 2 | 2 | 7 | 10.45 |
| DECATUR TWP. | 13,755 | 1.86 | 0 | 0 | 0 | 0 | 0 | 0 | -0- | 0 | 0 | 0 | 1 | 1 | 2 | 2.99 |
| PERRY TWP. | 59,778 | 8.07 | 1 | 0 | 1 | 0 | 2 | 4 | 19.01 | 0 | 0 | 1 | 1 | 1 | 3 | 4.48 |
| FRANKLIN TWP. | 8,929 | 1.21 | 0 | 0 | 0 | 0 | 0 | 0 | -0- | 0 | 0 | 0 | 0 | 0 | 0 | -0- |
| LAWRENCE TWP. | 49,553 | 6.69 | 0 | 0 | 1 | 0 | 1 | 2 | 9.51 | 2 | 2 | 0 | 3 | 2 | 9 | 13.44 |
| WARREN TWP. | 78,872 | 10.64 | 0 | 0 | 0 | 1 | 1 | 2 | 9.51 | 1 | 2 | 1 | 1 | 0 | 5 | 7.46 |
| MARION COUNTY | 741,234 | 100,000 | 5 | 1 | 6 | 2 | 7 | 21 | 100,000 | 11 | 12 | 14 | 15 | 15 | 67 | 100,000 |

SOURCES:

Column 1 - DX A25, Center and Washington Townships excluding Tract 220 and Center Township Ghetto computed from DX A25 minus the DX A9 1960-67 average for the excluded areas.

Column 2 - Calculated from Column 1. (Figures do not add to 100% due to rounding off.)

Columns 3 - 8 - PX6, PX 6 A-E, PX 71.

Column 9 - Calculated from Column 8. (Figures do not add to 100% due to rounding off.)

Columns 10 - 15 - PX 5, PX 5 A-E, PX 71.

Column 16 - Calculated from Column 15. (Figures do not add to 100% due to rounding off.)

The following Table No. 8 summarizes the preceding Table No. 7 and points up the inequities which have existed in representation of areas within Marion County, during the last decade, due to large multi-member districting. It is especially worth noting that Washington Township (including Tract 220) having 14.64% of the population was the residence of more than half the senators

and more than two-fifths of the representatives. Conversely, the Center Township Ghetto, having a 22% larger population, was the residence of approximately one-fourth of the senators and approximately one-third of the representatives it would have had if there had been a practice of having legislators reside in areas within Marion County in proportion to the population of the areas. The over-representation of Tract 220 is the most obvious.

## TABLE NO. 8

### REPRESENTATIONAL INEQUITIES, 1960-69

| Area | 1<br>1960-69<br>Avg. Pop.<br>As Percent<br>of Marion<br>County<br>Avg. Pop. | 2<br>Percent<br>of Marion<br>County<br>Senators<br>1960-68 | 3<br>Percent<br>of Marion<br>County<br>Representatives<br>1960-68 |
|---|---|---|---|
| Washington Twp. Excluding Tract 220 | 13.98 | 47.52 | 34.33 |
| Census Tract 220 | 0.66 | 4.75 | 7.46 |
| Center Twp. Excluding Ghetto | 23.32 | 4.75 | 11.94 |
| Center Twp. Ghetto | 17.81 | 4.75 | 5.97 |
| Wayne Township | 14.30 | - 0 - | 10.45 |
| Warren Township | 10.64 | 9.51 | 7.46 |
| Perry Township | 8.07 | 19.01 | 4.48 |
| Lawrence Township | 6.69 | 9.51 | 13.44 |
| Decatur Township | 1.86 | - 0 - | 2.99 |
| Pike Township | 1.49 | - 0 - | 1.49 |
| Franklin Township | 1.21 | - 0 - | - 0 - |

Sources:

    Column 1 - Table No. 7, Col. 2

    Column 2 - Table No. 7, Col. 9

    Column 3 - Table No. 7, Col. 16

The inequity of representation by residence of legislators between Washington and Center Townships is apparent from Tables No. 7 and 8. Washington Township, the upper middle-class and wealthy suburban area having 14.64% of the population of Marion County, was the residence of 52.27% of the senators and 41.79% of the representatives. Center Township, having 41.14% of the population (approximately three times as large), was the residence of 9.51% of the senators (less than one-fifth of Washington Township) and 17.91% of the representatives (approximately three-sevenths of Washington Township).

Even if Census Tract 220 were part of the Center Township Ghetto, which we have found it is not, the inequity of overrepresentation in Washington Township persists. If it were part, the Ghetto would have 18.47% of the population, 9.51% of the senators and 13.43% of the representatives. Washington Township excluding Tract 220 has 13.98% of the population, 47.52% of the senators and 34.33% of the representatives. The figures also show that the "1967 Ghetto Voting Area" of the complaint was underrepresented in the Senate (it had approximately half the senators it should have had). [Calculations made from Table No. 8, "*Representation Inequities*, 1960–69."].

The Negro Center Township Ghetto population is sufficient in size to elect approximately two members of the House of Representatives and approximately one senator if these were specific single-member legislative districts within Marion County.

The positions taken on political issues by the legislators elected from Marion County at large tend to coalesce, causing these legislators to maintain a common, undifferentiated position. This effect is largely the result of election at large from a common constituency, and obviates representation of a substantial, though minority, interest group within that common constituency.

As a general rule, for any given candidate to be elected to the General Assembly from Marion County, his or her party must prevail in the election.

The basis for the rule is that since 1920 only slightly more than 1% of the General Assembly candidates from Marion County have been elected from the political party which did not generally prevail.

The testimony shows that the county organizations of the two major political parties in Marion County, and particularly the County Chairmen, exert a very substantial influence over the nomination of General Assembly candidates. This pervasive influence would be substantially diminished by the use of specific single-member districts because the ability of candidates with sectional attractiveness to overcome the party's primary election recommendations would increase.

The testimony also shows the Marion County political organizations continue to exert considerable control over the actions of Marion County legislators after they are elected. This control results in large part from the multi-member districting scheme.

Multi-member districting in Marion County effectively renders the county-wide primary and general election ballots for the General Assembly excessively lengthy, making it difficult for even the conscientious voter to make a rational selection.

## CONCLUSIONS AS TO THE MERITS

■ Applying the legal principles and standards above to the evidence adduced in this action, we find that the multi-member districting provisions of the present legislative apportionment statutes of Indiana, Indiana Acts 1965 (2d Spec.Sess.), ch. 5, sec. 3, and ch. 4, sec. 3 (Ind.Ann.Stat. §§ 34–102, 34–104 (Burns' Supp.1968)), as they relate to Marion County, operate to minimize and cancel out the voting strength of a minority racial group, Negroes residing in the Center Township Ghetto, including

the plaintiff, Mason Bryant, to the extent that they are deprived of equal protection of the laws under the Fourteenth Amendment of the Constitution of the United States.

The first requirement implicit in Fortson v. Dorsey and Burns v. Richardson, that of an identifiable racial or political element within the multi-member district, is met by the Negro residents of the Center Township Ghetto. These Negro residents have interests in areas of substantive law such as housing regulations, sanitation, welfare programs (aid to families with dependent children, medical care, etc.), garnishment statutes, and unemployment compensation, among others, which diverge significantly from the interests of nonresidents of the Ghetto.

Second, the voting strength of this cognizable element is severely minimized within the senate and house districts of Marion County. Minimization has been proven to occur by virtue of the strong control which the Marion County political parties exert over the nomination of legislative candidates in the primary election, the consequent inability of the Negro voters in the Center Township Ghetto to be assured of the opportunity of voting for prospective legislators of their choice, and the absence of any particular legislator accountable to the described voters for his legislative record. Under the evidence before the Court such invidious effects will continue so long as Marion County is apportioned into large senate and house multi-member districts.

As demonstrated by the testimony of plaintiff Chavis in particular, a legislator elected from Marion County is hesitant to express the interests of the residents of the Center Township Ghetto unequivocally in the legislative chambers, though he may believe it proper that those interests be furthered. The party organizations, of necessity, exert considerable control over the nominating process in Marion County. Even a conscientious primary voter is unable to

familiarize himself with the position taken by each of the scores of persons contesting for the legislative nominations of each party. The average primary voter generally must accept the recommendations of his party or vote blindly. This control hinders the individual legislator from taking a legislative position contrary to that suggested by his party organization. Control over nomination is largely control over position. Thus a particular legislator risks his political demise by consistently taking a legislative position divergent from that of the majority of the legislators of his party from Marion County.

The minimization of voting strength as described above prevents responsive and effective legislative representation of the described Ghetto voters, though they are numerically large.

The defendants argue that the plaintiffs have ample legislative representation because they are part of the constituency of each Marion County legislator, and each legislator must be somewhat responsive to their wishes. Partial responsiveness of all legislators is asserted to equal total responsiveness and the informed concern of a few specific legislators. To the contrary, under the circumstances of this case, and the proof adduced, we find the present districting scheme operates to minimize the voting strength of a cognizable racial element. Burns v. Richardson, *supra*.

We further note that under Burns v. Richardson, at p. 88, invidious discrimination resulting from a multi-member districting scheme can be more easily shown if certain circumstances, which were not present in Fortson v. Dorsey, obtain. This case presents each of those circumstances, leading to the legal conclusions here stated.

First, Marion County elects fifteen state representatives and eight state senators at large; these numbers are large (15% and 16% of each house respectively) in relation to the total number of Indiana legislators.

Second, Marion County is not subdistricted to assure distribution of legislators who are resident over the entire county. Under the districting scheme attacked in *Fortson*, twenty-one senatorial districts were allotted in groups of from two to seven among the seven most populous counties, but voters in these districts did not elect a senator by a district-wide vote; instead they joined with the voters of the other districts of the county in electing all of the county's senators by a county-wide vote. However, each senator was required to be a resident of his own senatorial district. Thus geographical distribution of senators throughout each highly populous county was assured, although the senators were elected at large by the constituency of the entire county. In the case at bar, however, we find that both Marion County senators and representatives have consistently resided in one geographical area, *i. e.*, Washington Township, in numbers far exceeding those that would be expected from Washington Township's percentage of the population of Marion County.

Third, multi-member districts were utilized in Georgia only for the state senate; in Indiana such districts characterize both houses of the General Assembly. Consequently Negroes residing in the Center Township Ghetto have a lesser chance for representation in both houses of the legislature under the present multi-member districting.

Turning to state-wide redistricting, to redistrict Marion County alone would leave the legislature confronted with impermissible population variations between new Marion County districts and other districts in the state.

As a part of this opinion the Court has included Appendices A, B, C, and D, showing population characteristics of senate and house districts, and representation characteristics of the senate and house districts.

For example, as shown by Appendix B, under the 1967 Indiana Board of Health Vital Statistics population estimates, Marion County (Senate District 19), with a population of 762,000 electing eight senators, is overrepresented in the Senate by 5.674% in comparison to a mathematically ideal senate district of 100,980. Relating this overrepresentation to the 18.934% underrepresentation of Elkhart County (Senate District 5), with an estimated population of 120,100 electing one senator, according to the same Vital Statistics estimates, there is a total variation between the two of 24.608%.

Based on the 1960 actual population figures, Marion County, with a population of 697,567, is overrepresented in the Senate by 6.491%, while Elkhart County, with a population of 106,790, is underrepresented by 14.521%, showing a total variation of 21.012%.

In the House, using the 1967 Vital Statistics figures, Marion County (House District 26) is underrepresented by 0.614%, while Knox County (House District 36) is overrepresented by 18.202%, showing a population variation of 18.816%.

According to the 1960 actual population figures, Marion County is overrepresented by 0.260%, while Floyd County (House District 35) is underrepresented by 13.679%, showing a population variation of 13.93%.

Taking the state as a whole and applying the 1967 Board of Health Vital Statistics figures, the senate districts range from 82,900 (Senate District 25—Gibson, Knox, and Pike Counties) to 120,100 (Senate District 5—Elkhart County) in population per senator, or from 17.905% overrepresented to 18.934% underrepresented. The ratio between the largest and the smallest district is thus 1.449 to 1. The deviation from the ideal population per senator according to these figures is greater than 17% in two senatorial districts, is greater than 14% in one more district, and is greater than 10% in three other districts.

Making a similar analysis of the senate districts under the 1960 census figures, they range from 80,496 (Senate

District 20—Wayne and Union Counties) to 106,790 (Senate District 5—Elkhart County) in population per senator, or from 13.676% overrepresented to 14.-521% underrepresented. The ratio between the largest and the smallest district according to the 1960 figures is 1.327 to 1. The deviation from the ideal population per senator is greater than 14% in one senatorial district, is greater than 13% in one more district, and is greater than 10% in still five other districts.

In the House, according to the 1967 Vital Statistics population estimates, the population per representative ranges from 41,300 (House District 36—Knox County) to 60,133 (House District 25—Hendricks, Johnson, Morgan, and Shelby Counties), in population per representative, or from 18.202% overrepresented to 19.099% underrepresented. The ratio between the largest and the smallest district is thus 1.456 to 1. The deviation from the ideal population per representative is greater than 19% in one representative district, is greater than 18% in one more district, and is greater than 16% in two more districts, and greater than 10% in still eight more districts.

Making a like analysis of the house districts under the 1960 census figures, the house districts range from 41,449 (House District 39—Vanderburgh County) to 53,003 (House District 35—Floyd County) in population per representative, or from 11.101% overrepresented to 13.679% underrepresented. The ratio between the largest and the smallest district, according to the 1960 figures is 1.279 to 1. The deviation from the ideal population per representative according to the 1960 population figures is greater than 13% in one district, is greater than 11% in one more district, and is greater than 10% in still three more districts.

The Court realizes that the 1970 census results will be available in approximately eleven months, and that to undertake a state-wide apportionment before that time necessitates use of the 1960 census statistics and the 1967 Indiana State Board of Health Vital Statistics. Under the Indiana primary election statutes,[13] candidates for the 1971 General Assembly will be required to file for office with the Indiana Secretary of State before the 1970 census statistics are available for use in redistricting. Therefore, the 1971 Indiana General Assembly would be elected under the present invalid apportionment and the first General Assembly properly apportioned according to the 1970 census would be the 1973 General Assembly. To allow such a lengthy interim of malapportionment would violate the rights of the plaintiffs and would contravene the rationale of Swann v. Adams, 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966). For that reason this Court is of the opinion that the total reapportionment should proceed immediately rather than waiting for the 1970 census statistics.

In Stout v. Bottorff, 246 F.Supp. 825 at 831 (1965), the Court, having in mind the Indiana constitutional prohibition against dividing counties for senatorial apportionment,[14] expressed the hope that the Indiana General Assembly could rearrange the legislative districts to meet the Indiana as well as the Federal Constitution. The Court recognized the dilemma that faced the legislators in performing the task if the limitations of the Indiana Constitution, and especially its interpretation by the decision in Denney v. State ex rel. Basler, 144 Ind. 503, 42 N.E. 929, 31 L.R.A. 726 (1896), continued to stand in the way and prevent the legislative districts being established in accordance with the federal standard. The Court noted that

13. Ind.Ann.Stat. § 29–3605 (Burns' Supp. 1968).

14. "A Senatorial or Representative District, where more than one county shall constitute a district, shall be composed of contiguous counties; and no county, for Senatorial apportionment, shall ever be divided." Art. 4, Sec. 6, Indiana Constitution.

an apportionment scheme based on state constitutional provisions which fails to meet the federal standard is violative of the Fourteenth Amendment, and in the case of such an "'unavoidable conflict' between the Federal and State Constitutions, 'the Supremacy Clause of course controls.' Reynolds v. Sims, 377 U.S. [533] at 584, 84 S.Ct. [1362] at 1393 [12 L.Ed.2d 506] (1964)." The Court observed that the Indiana legislature was required to make every possible effort to accommodate the apportionment provisions of the Indiana Constitution and the rule of the *Denney* case, but the Court cautioned that it could not accommodate either the Indiana constitutional apportionment requirement or the rule in *Denney* at the expense of violating the Equal Protection Clause of the Fourteenth Amendment by failing to accord substantial equality of representation in the General Assembly to voters of Indiana.

The Indiana General Assembly met the dilemma and enacted an apportionment scheme which did not cross county lines. This scheme was found acceptable to the Court in the second *Stout* case, 249 F.Supp. 488 (1965). This may not be possible again. Since that case, the geographical standards established by Reynolds v. Sims have been clarified and narrowed as heretofore noted.

In the course of these proceedings, the status of the respective plaintiffs and the quantum of proof adduced in their behalf were questioned.

As to the plaintiffs Marilyn Hotz and Rowland Allen, there is a failure of proof to establish a basis for granting the relief prayed for in the complaint.

The evidence shows that plaintiff Marilyn Hotz is a white person, by political preference a Republican who actively votes in both the Republican primary and the general elections. She resides in Marion County but outside the City of Indianapolis in what the complaint describes as the "White Suburban Belt." She has voted for precinct committeemen and vice-committeemen in the Republican primary elections and on General Assembly seats in the Republican primary elections. When asked whether she made an individual voter's choice, she stated that she voted "the slate." Her complaint is that persons living outside the City include less than one-third of the population of Marion County but almost one-half of the regular Republican voters of the county, and that such residents are deprived of a proportionate voice as to who their Republican state legislators shall be, in years of Republican victory in Marion County. While the evidence indicates the selection of tickets of candidates for Republican primary elections are put together by the party organization and the election of the legislative delegation from Marion County is elected at large, the evidence falls short of establishing that plaintiff Hotz's interests are significantly different from those of other Republican voters in the years of Republican victory. And while her voice as to whom the Republican state legislators shall be may not be proportionate to the percentage of Marion County Republican voters who live outside the City of Indianapolis, this complaint primarily is directed to intra-party organization and selection of candidates and does not in our opinion rise to the degree of a constitutional deprivation of equal protection by reason of the statutes here under attack.

Plaintiff Rowland Allen (who describes himself as a political independent) complains, like Marilyn Hotz, that he is frustrated in his effort to cast a vote based upon the individual merit of candidates and the issues presented in their campaigns, by reason of the length of the ballots relating to General Assemblymen. His complaint is that he is increasingly bewildered by the number of candidates for election to the General Assembly. Plaintiff Allen, a retired businessman, and former Personnel Director of L. S. Ayres & Co., asserted in his testimony that when he voted he had an opinion only as to some of the

candidates and that he had not found a source available by which he could form an opinion as to all candidates.

■ While plaintiff Allen's testimony suggests the desirability of single-member districting, the factor of lengthy ballots alone is not sufficient to justify a declaration of the unconstitutionality of multi-member districting.

■ While we find that the plaintiff Chavis is a Negro, residing in Marion County, a practicing lawyer with offices in the Center Township Ghetto, with fifteen years of practice in the Ghetto, with eighty-five to ninety percent of his clients living in the Ghetto Area, a former member of the Indiana Senate, and a Ward Chairman of his political party in the Center Township Ghetto, a man whose interests obviously lie with those who reside in the Center Township Ghetto, still we find that he is not a resident nor a voter in the Center Township Ghetto and therefore is entitled to no relief.

Plaintiff Walker appears before the Court in two statuses. His first status is as a Negro voter resident in Lake County, and his second status is as an Indiana voter who is resident outside Marion County.

■ In his first status it is alleged that the Negro populations of Lake and Marion Counties are approximately equal and should be entitled to equal representation. It is alleged that since Negroes in Lake County can vote for only five senators and eleven representatives, as opposed to Marion County Negroes who vote for eight senators and fifteen representatives, then plaintiff Walker has only five-eighths and eleven-fifteenths representation in the respective houses of the General Assembly and is, therefore, allegedly underrepresented. The Court holds that this position is untenable in this case because it is not supported in the record before us.

It has not been shown that Lake County Negroes have a socioeconomic distribution and status comparable to those in Marion County.

Neither has it been shown by sufficient evidence that Lake County Negroes are a racial minority group which has been deprived of representation so as to distinguish them from other Lake County resident voters.

Finally, the assumption of underrepresentation does not take into consideration this Court's finding that the evidence only shows that Negro voters resident in the Center Township Ghetto are significantly underrepresented as a racial and socioeconomic minority group.

■ In his second status, we find that plaintiff Walker is a voter of Indiana who resides outside Marion County. Applying the uniform district principle, discussed *infra* in the remedy section, we find that he probably has received less effective representation than Marion County voters. It has been shown that he votes for fewer legislators and, therefore, has fewer legislators to speak for him. He also, theoretically, casts fewer critical votes than Marion County voters, but we decline to so hold in the absence of sufficient evidence as to other factors such as bloc and party voting in Lake County. We hold that, in the absence of stronger evidence of dilution, his remedy is limited to the consideration which should be given to the uniform district principle in any subsequent reapportionment of the Indiana General Assembly.

While it is alleged that plaintiff Ramsey is a Negro resident and voter of the 1967 Ghetto Voting Area specified in the complaint, there is no evidence that he resides in the Center Township Ghetto. Thus, unlike plaintiff Bryant, he has not shown by sufficient evidence that he is underrepresented, as he may live outside the Center Township Ghetto.

The evidence establishes that plaintiff Mason Bryant is a resident and a voter of the Center Township Ghetto,

with proper standing to sue, and thus is entitled to the relief prayed for.

## THE REMEDY

█ In view of the evidence presented, the present at large districting scheme for Marion County unconstitutionally minimizes and renders ineffective the vote of the Negroes residing in the Center Township Ghetto. Hence a redistricting of Marion County is necessitated.

Although the plaintiffs in this case have directed their complaint to bring about a redistricting of Marion County, this Court must necessarily consider the evidence as it applies to both Marion County and the State of Indiana as a whole. As the United States Supreme Court stated in Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 673, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964), "[r]egardless of possible concessions made by the parties and the scope of the consideration of the courts below, in reviewing a state legislative apportionment case this Court must of necessity consider the challenged scheme as a whole in determining whether the particular State's apportionment plan, in its entirety, meets federal constitutional requisites."

Once the determination is made that Marion County should be redistricted to correct the invidious minimization of the voting strength of a cognizable racial minority group, it becomes clear beyond question that the evidence adduced in this case and the additional apportionment requirements set forth by the Supreme Court call for a redistricting of the entire state as to both houses of the General Assembly.

In the performance of its task the General Assembly might wish to give consideration to certain principles of legislative apportionment brought out at the trial in these proceedings.

In this regard, the Court in no way intends to intimate by this opinion that the Negroes residing in the Center Township Ghetto are entitled to a certain number of legislators. Legislative districts are to be drawn with an eye that is color-blind; but the Court notes that sophisticated gerrymandering has been soundly condemned. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

Much has been said, before and during the trial of this case, concerning the "critical vote" analysis of Banzhaf, Multi-Member Electoral Districts—Do They Violate the "One Man, One Vote" Principle, 75 Yale L.J. 1309, esp. 1319–24 (1966). Cf. Kilgarlin v. Hill, 386 U.S. 120, 125 n. 3, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). This analysis purports to show that where District A elects one representative from two candidates and District B, which is eight times as populous as District A, elects eight representatives from sixteen candidates, voters in District B cast more "critical votes," i. e., break a theoretical tie, than voters in District A. We take a simpler view of the situation than is presented in the cited article. Applying the analysis for example to the facts in this case, voters in Johnson and Bartholomew Counties, a single-member senatorial district, choose between two senatorial candidates while voters in Marion County choose between sixteen candidates for eight senate seats. It is clear that each voter in Marion County has a greater theoretical opportunity to cast a critical or deciding vote in any legislative election under the present districting scheme.

John Banzhaf, Associate Professor of Law at George Washington University, testified that when the representatives of a multi-member district vote as a bloc in a legislative body, each representative's vote has a greater weight than that of a representative from a single-member district. Having found that the Marion County elected delegations usually do vote in blocs, we believe that the testimony has application here. Also, as each member of the bloc delegation is

responsible to the voter majority who elected the whole, each Marion County voter has a greater voice in the legislature, having more legislators to speak for him than does a comparable voter in the Johnson-Bartholomew single-member senatorial district.

Conversely, we note that if all districts were equal in size and elected equal numbers of legislators, then all constituents of each district would have the same voice in the legislature. If the districts were uniform and not unduly large, this would be an effective means of giving each citizen equal voting power, e. g., Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), while avoiding problems of diluting political or racial minority group voting power, Fortson v. Dorsey, 379 U.S. 433, 438–439, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), and Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

The use of uniform districts is one method of curing defects in unequal representation. The principle is that equal numbers of persons should be represented by equal numbers of legislators in each district of a legislative body. This would eliminate problems of critical vote inequality, unequal bloc representation and unequal numbers of voices in the legislature per person. While application of the uniform district principle would require all districts to be equal in population and elect equal numbers of legislators from each uniform district, it does not require single-member districts. For example, the Indiana House of Representatives could consist of 100 districts electing one representative each, fifty districts with two representatives each, twenty-five districts with four representatives each, or (assuming a lowering of the size of the House from 100 to 99 members) thirty-three districts electing three representatives each. We believe that the Indiana General Assembly, if it does the apportionment found to be needed here, should give consideration to the uniform district principle in making its apportionment. The maximum size of the uniform districts should, of course, not be so large as to create the improper dilution of minority group voting strength found in the instant case.

While recognizing the right of the injured plaintiffs to have their constitutional rights vindicated at the earliest practicable time, we must also recognize that the federal judiciary functions within a system of federalism which entrusts the responsibility of legislative apportionment and districting primarily to the state legislature. We must therefore afford Governor Edgar D. Whitcomb a reasonable opportunity to call a Special Session of the General Assembly of the State of Indiana so that it may enact legislation to redistrict the State and reapportion the legislative seats in the General Assembly in accordance with federal constitutional requirements and in compliance with this opinion. An injunction will not issue at this time and the State will be given until October 1, 1969, to enact statutes redistricting the State and reapportioning the legislative seats in the General Assembly to remedy the improper districting and malapportionment we have found.

This cutoff date is one by which there would have to be filed with the Court an enactment approved by both houses of the Indiana General Assembly and signed into law by the Governor. If the legislature does not act, or if its action does not meet constitutional standards, our duty will be clear to take such action as is necessary to accord the injured plaintiffs their rights.

Due to the relative proximity in time of the initial filing date for candidates for the next primary election for members of the Indiana General Assembly [February 24, 1970], no final judgment will issue without an adequate apportionment plan being approved and/or promulgated therein.

APPENDIX A

## POPULATION CHARACTERISTICS OF SENATE DISTRICTS
### INDIANA SENATE

| District | Counties | County Pop. 1960 Census | Dist. Pop. 1960 Census | County Pop. 1967 (Est.) | Dist. Pop. 1967 (Est.) | Senators per Dist. | Dist. Population Per Senator 1960 | 1967 Est. |
|---|---|---|---|---|---|---|---|---|
| 1 | Lake | 513,269 | 513,269 | 536,300 | 536,300 | 5 | 102,654 | 107,260 |
| 2 | Jasper | 18,842 | 90,173 | 19,400 | 113,400 | 1 | 90,173 | 113,400 |
|  | Newton | 11,052 |  | 11,600 |  |  |  |  |
|  | Porter | 60,279 |  | 82,400 |  |  |  |  |
| 3 | LaPorte | 95,111 | 95,111 | 106,200 | 106,200 | 1 | 95,111 | 106,200 |
| 4 | Marshall | 32,443 | 271,057 | 34,500 | 286,200 | 3 | 90,352 | 95,400 |
|  | St. Joseph | 238,614 |  | 251,700 |  |  |  |  |
| 5 | Elkhart | 106,790 | 106,790 | 120,100 | 120,100 | 1 | 106,790 | 120,100 |
| 6 | Kosciusko | 40,373 | 103,099 | 45,700 | 113,300 | 1 | 103,099 | 113,300 |
|  | Lagrange | 17,380 |  | 19,300 |  |  |  |  |
|  | Noble | 28,162 |  | 29,900 |  |  |  |  |
|  | Steuben | 17,184 |  | 18,400 |  |  |  |  |
| 7 | Adams | 24,643 | 285,110 | 26,500 | 320,500 | 3 | 95,037 | 109,833 |
|  | Allen | 232,196 |  | 263,200 |  |  |  |  |
|  | DeKalb | 28,271 |  | 30,800 |  |  |  |  |
| 8 | Huntington | 33,814 | 87,373 | 35,600 | 93,300 | 1 | 87,373 | 93,300 |
|  | Wabash | 32,605 |  | 34,600 |  |  |  |  |
|  | Whitley | 20,954 |  | 23,100 |  |  |  |  |
| 9 | Cass | 40,931 | 95,888 | 41,900 | 100,500 | 1 | 95,888 | 100,500 |
|  | Fulton | 16,957 |  | 16,900 |  |  |  |  |
|  | Miami | 38,000 |  | 41,700 |  |  |  |  |
| 10 | Benton | 11,912 | 87,845 | 11,600 | 91,800 | 1 | 87,845 | 91,800 |
|  | Carroll | 16,934 |  | 18,100 |  |  |  |  |
|  | Pulaski | 12,837 |  | 12,800 |  |  |  |  |
|  | Starke | 17,911 |  | 18,800 |  |  |  |  |
|  | Warren | 8,545 |  | 9,200 |  |  |  |  |
|  | White | 19,709 |  | 21,300 |  |  |  |  |
| 11 | Tippecanoe | 89,122 | 89,122 | 98,000 | 98,000 | 1 | 89,122 | 98,000 |
| 12 | Howard | 69,509 | 85,365 | 80,600 | 98,100 | 1 | 85,365 | 98,100 |
|  | Tipton | 15,856 |  | 17,500 |  |  |  |  |
| 13 | Blackford | 14,792 | 90,533 | 15,700 | 96,400 | 1 | 90,533 | 96,400 |
|  | Grant | 75,741 |  | 80,700 |  |  |  |  |
| 14 | Delaware | 110,938 | 183,164 | 122,900 | 200,900 | 2 | 91,582 | 100,450 |
|  | Jay | 22,572 |  | 24,200 |  |  |  |  |
|  | Randolph | 28,434 |  | 30,200 |  |  |  |  |
|  | Wells | 21,220 |  | 23,600 |  |  |  |  |
| 15 | Hancock | 26,665 | 201,383 | 32,800 | 221,600 | 2 | 100,692 | 110,800 |
|  | Henry | 48,899 |  | 52,800 |  |  |  |  |
|  | Madison | 125,819 |  | 136,400 |  |  |  |  |
| 16 | Boone | 27,543 | 98,440 | 29,700 | 109,500 | 1 | 98,440 | 109,500 |
|  | Clinton | 30,765 |  | 32,300 |  |  |  |  |
|  | Hamilton | 40,132 |  | 47,500 |  |  |  |  |
| 17 | Fountain | 18,706 | 90,526 | 18,600 | 93,400 | 1 | 90,526 | 93,400 |
|  | Montgomery | 32,089 |  | 33,300 |  |  |  |  |
|  | Parke | 14,804 |  | 14,900 |  |  |  |  |
|  | Putnam | 24,927 |  | 26,600 |  |  |  |  |
| 18 | Hendricks | 40,896 | 86,171 | 49,800 | 103,700 | 1 | 86,171 | 103,700 |
|  | Morgan | 33,875 |  | 41,500 |  |  |  |  |
|  | Owen | 11,400 |  | 12,400 |  |  |  |  |
| 19 | Marion | 697,567 | 697,567 | 762,000 | 762,000 | 8 | 87,196 | 95,250 |

| District | Counties | County Pop. 1960 Census | Dist. Pop. 1960 Census | County Pop. 1967 (Est.) | Dist. Pop. 1967 (Est.) | Senators per Dist. | Dist. Population Per Senator 1960 | 1967 Est. |
|---|---|---|---|---|---|---|---|---|
| 20 | Union | 6,457 | 80,496 | 7,000 | 89,100 | 1 | 80,496 | 89,100 |
| | Wayne | 74,039 | | 82,100 | | | | |
| 21 | Decatur | 20,019 | 98,959 | 22,600 | 105,900 | 1 | 98,959 | 105,900 |
| | Fayette | 24,454 | | 25,400 | | | | |
| | Rush | 20,393 | | 20,700 | | | | |
| | Shelby | 34,093 | | 37,200 | | | | |
| 22 | Bartholomew | 48,198 | 91,902 | 56,900 | 108,800 | 1 | 91,902 | 108,800 |
| | Johnson | 43,704 | | 51,900 | | | | |
| 23 | Clay | 24,207 | 172,069 | 24,500 | 172,300 | 2 | 86,035 | 86,150 |
| | Sullivan | 21,721 | | 20,500 | | | | |
| | Vermillion | 17,683 | | 16,700 | | | | |
| | Vigo | 108,458 | | 110,600 | | | | |
| 24 | Brown | 7,024 | 92,576 | 8,000 | 106,700 | 1 | 92,567 | 106,700 |
| | Greene | 26,327 | | 26,600 | | | | |
| | Monroe | 59,225 | | 72,100 | | | | |
| 25 | Gibson | 29,949 | 84,307 | 29,400 | 82,900 | 1 | 84,307 | 82,900 |
| | Knox | 41,561 | | 41,300 | | | | |
| | Pike | 12,797 | | 12,200 | | | | |
| 26 | Posey | 19,214 | 185,008 | 21,100 | 189,400 | 2 | 92,504 | 94,700 |
| | Vanderburgh | 165,794 | | 168,300 | | | | |
| 27 | Daviess | 26,636 | 104,358 | 27,300 | 100,700 | 1 | 104,358 | 100,700 |
| | Dubois | 27,463 | | 30,200 | | | | |
| | Martin | 10,608 | | 11,000 | | | | |
| | Spencer | 16,074 | | 16,700 | | | | |
| | Warrick | 23,577 | | 25,500 | | | | |
| 28 | Jackson | 30,556 | 101,816 | 33,100 | 107,500 | 1 | 101,816 | 107,500 |
| | Lawrence | 36,564 | | 37,700 | | | | |
| | Orange | 16,877 | | 17,000 | | | | |
| | Washington | 17,819 | | 19,700 | | | | |
| 29 | Crawford | 8,379 | 97,821 | 8,500 | 101,100 | 1 | 97,821 | 101,100 |
| | Floyd | 53,003 | | 53,900 | | | | |
| | Harrison | 19,207 | | 19,700 | | | | |
| | Perry | 17,232 | | 19,000 | | | | |
| 30 | Clark | 66,453 | 105,157 | 68,200 | 109,700 | 1 | 105,157 | 109,700 |
| | Jefferson | 24,061 | | 25,200 | | | | |
| | Scott | 14,643 | | 16,300 | | | | |
| 31 | Dearborn | 28,674 | 104,854 | 30,000 | 99,300 | 1 | 104,854 | 99,300 |
| | Franklin | 17,015 | | 17,000 | | | | |
| | Jennings | 17,267 | | 19,600 | | | | |
| | Ohio | 4,165 | | 3,900 | | | | |
| | Ripley | 20,641 | | 22,500 | | | | |
| | Switzerland | 7,092 | | 6,300 | | | | |
| State Total | | 4662,498 | 4662,498 | 5049,000 | 5049,000 | 50 | *93,249 | *100,980 |

* Average = Ideal District

Sources: Apportionment and districting according to Burns' Ind. Stat. §34-104 (1965, Supp. 1968).
1967 county population estimates based on DX J pp. 20-22.
All calculations made by the Court.

APPENDIX B

REPRESENTATION CHARACTERISTICS
OF
SENATE DISTRICTS

| District | District Population as Percentage of Ideal District | | Degree of Over- or Underrepresentation (Variation from Ideal) | |
|---|---|---|---|---|
| | 1960 | 1967 | 1960 | 1967 |
| 1 | 110.086 | 106.219 | -10.086% | - 6.219% |
| 2 | 96.701 | 112.299 | + 3.299% | -12.299% |
| 3 | 101.997 | 105.169 | - 1.997% | - 5.169% |
| 4 | 96.893 | 94.474 | + 3.107% | + 5.526% |
| 5 | 114.521 | 118.934 | -14.521% | -18.934% |
| 6 | 110.563 | 112.200 | -10.563% | -12.200% |
| 7 | 101.917 | 108.767 | - 1.917% | - 8.767% |
| 8 | 93.697 | 92.395 | + 6.303% | + 7.605% |
| 9 | 102.830 | 99.525 | - 2.830% | + 0.475% |
| 10 | 94.205 | 90.909 | + 5.795% | + 9.091% |
| 11 | 95.574 | 97.049 | + 4.426% | + 2.951% |
| 12 | 91.545 | 97.148 | + 8.455% | + 2.852% |
| 13 | 97.087 | 95.464 | + 2.913% | + 4.536% |
| 14 | 98.212 | 99.475 | + 1.788% | + 0.525% |
| 15 | 107.982 | 109.725 | - 7.982% | - 9.725% |
| 16 | 105.567 | 108.437 | - 5.567% | - 8.437% |
| 17 | 97.080 | 92.494 | + 2.920% | + 7.506% |
| 18 | 92.410 | 102.694 | + 7.590% | - 2.694% |
| 19 | 93.509 | 94.326 | + 6.491% | + 5.674% |
| 20 | 86.324 | 88.235 | +13.676% | +11.765% |
| 21 | 106.123 | 104.872 | - 6.123% | - 4.872% |
| 22 | 98.555 | 107.744 | + 1.445% | - 7.744% |
| 23 | 92.264 | 85.314 | + 7.736% | +14.686% |
| 24 | 99.278 | 105.664 | + 0.722% | - 5.644% |
| 25 | 90.411 | 82.095 | + 9.589% | +17.905% |
| 26 | 99.201 | 93.781 | + 0.799% | + 6.219% |
| 27 | 111.913 | 99.723 | -11.913% | + 0.277% |
| 28 | 109.187 | 106.457 | - 9.187% | - 6.457% |
| 29 | 104.903 | 100.119 | - 4.903% | - 0.119% |
| 30 | 112.770 | 108.635 | -12.770% | - 8.635% |
| 31 | 112.445 | 98.336 | -12.445% | + 1.664% |

SUMMARY

| | 1960 | 1967 |
|---|---|---|
| Range of Variation | 28.197% | 36.839% |
| Ratio of Largest to Smallest | 1.327 | 1.449 |
| Mean Variation (Dist. | 6.447% | 7.006% |
| Districts Varying by More Than ±5.000% | 18/31 | 21/31 |
| Districts Varying by More Than ±1.000% | 29/31 | 27/31 |

Source: Calculations made by Court from Appendix A.

APPENDIX C

POPULATION CHARACTERISTICS
OF HOUSE DISTRICTS
INDIANA HOUSE OF REPRESENTATIVES

| Dis-trict | Counties | County Pop. 1960 Census | Dist. Pop. 1960 Census | County Pop. 1967 (Est.) | Dist. Pop. 1967 (Est.) | Representatives per Dist. | Dist. Population Per Representative 1960 | 1967 Est. |
|---|---|---|---|---|---|---|---|---|
| 1 | Lake | 513,269 | 513,269 | 536,300 | 536,300 | 11 | 46,661 | 48,755 |
| 2 | Jasper | 18,842 | 91,958 | 19,400 | 114,600 | 2 | 45,979 | 57,300 |
|  | Porter | 60,279 |  | 82,400 |  |  |  |  |
|  | Pulaski | 12,837 |  | 12,800 |  |  |  |  |
| 3 | LaPorte | 95,111 | 95,111 | 106,200 | 106,200 | 2 | 47,056 | 53,100 |
| 4 | St. Joseph | 238,614 | 238,614 | 251,700 | 251,700 | 5 | 47,729 | 50,340 |
| 5 | Elkhart | 106,790 | 152,332 | 120,100 | 169,300 | 3 | 50,777 | 56,433 |
|  | Lagrange | 17,380 |  | 19,300 |  |  |  |  |
|  | Noble | 28,162 |  | 29,900 |  |  |  |  |
| 6 | DeKalb | 28,271 | 45,455 | 30,800 | 49,200 | 1 | 45,455 | 49,200 |
|  | Steuben | 17,184 |  | 18,400 |  |  |  |  |
| 7 | Benton | 11,912 | 42,673 | 11,600 | 44,500 | 1 | 42,673 | 44,500 |
|  | Newton | 11,052 |  | 11,600 |  |  |  |  |
|  | White | 19,709 |  | 21,300 |  |  |  |  |
| 8 | Marshall | 32,443 | 50,354 | 34,500 | 53,300 | 1 | 50,354 | 53,300 |
|  | Starke | 17,911 |  | 18,800 |  |  |  |  |
| 9 | Fulton | 16,957 | 144,703 | 16,900 | 155,900 | 3 | 48,234 | 51,967 |
|  | Huntington | 33,814 |  | 35,600 |  |  |  |  |
|  | Kosciusko | 40,373 |  | 45,700 |  |  |  |  |
|  | Wabash | 32,605 |  | 34,600 |  |  |  |  |
|  | Whitley | 20,954 |  | 23,100 |  |  |  |  |
| 10 | Allen | 232,196 | 232,196 | 263,200 | 263,200 | 5 | 46,439 | 52,640 |
| 11 | Adams | 24,643 | 45,863 | 26,500 | 50,100 | 1 | 45,863 | 50,100 |
|  | Wells | 21,220 |  | 23,600 |  |  |  |  |
| 12 | Carroll | 16,934 | 95,865 | 18,100 | 101,700 | 2 | 47,933 | 50,850 |
|  | Cass | 40,931 |  | 41,900 |  |  |  |  |
|  | Miami | 38,000 |  | 41,700 |  |  |  |  |
| 13 | Fountain | 18,706 | 44,934 | 18,600 | 44,500 | 1 | 44,934 | 44,500 |
|  | Vermillion | 17,683 |  | 16,700 |  |  |  |  |
|  | Warren | 8,545 |  | 9,200 |  |  |  |  |
| 14 | Tippecanoe | 89,122 | 89,122 | 98,000 | 98,000 | 2 | 44,561 | 49,000 |
| 15 | Montgomery | 32,089 | 46,173 | 33,300 | 48,200 | 1 | 46,173 | 48,200 |
|  | Parke | 14,804 |  | 14,900 |  |  |  |  |
| 16 | Boone | 27,543 | 98,440 | 29,700 | 109,500 | 2 | 49,220 | 54,750 |
|  | Clinton | 30,765 |  | 32,300 |  |  |  |  |
|  | Hamilton | 40,132 |  | 47,500 |  |  |  |  |
| 17 | Howard | 69,509 | 85,365 | 80,600 | 98,100 | 2 | 42,683 | 49,050 |
|  | Tipton | 15,856 |  | 17,500 |  |  |  |  |
| 18 | Blackford | 14,792 | 90,533 | 15,700 | 96,400 | 2 | 45,267 | 48,200 |
|  | Grant | 75,741 |  | 80,700 |  |  |  |  |
| 19 | Madison | 125,819 | 125,819 | 136,400 | 136,400 | 3 | 41,938 | 45,467 |
| 20 | Delaware | 110,938 | 133,510 | 122,900 | 147,100 | 3 | 44,503 | 49,033 |
|  | Jay | 22,572 |  | 24,200 |  |  |  |  |
| 21 | Henry | 48,899 | 48,899 | 52,800 | 52,800 | 1 | 48,899 | 52,800 |
| 22 | Randolph | 28,434 | 102,473 | 30,200 | 112,300 | 2 | 51,237 | 56,150 |
|  | Wayne | 74,039 |  | 82,100 |  |  |  |  |
| 23 | Vigo | 108,458 | 130,179 | 110,600 | 131,100 | 3 | 43,393 | 43,700 |
|  | Sullivan | 21,721 |  | 20,500 |  |  |  |  |
| 24 | Clay | 24,207 | 49,134 | 24,500 | 51,100 | 1 | 49,134 | 51,100 |
|  | Putnam | 24,927 |  | 26,600 |  |  |  |  |

| Dist-trict | Counties | County Pop. 1960 Census | Dist. Pop. 1960 Census | County Pop. 1967 (Est.) | Dist. Pop. 1967 (Est.) | Repre-senta-tives per Dist. | Dist. Population Per Representative 1960 | 1967 Est. |
|---|---|---|---|---|---|---|---|---|
| 25 | Hendricks | 40,896 | 152,568 | 49,800 | 180,400 | 3 | 50,859 | 60,133 |
|  | Johnson | 43,704 |  | 51,900 |  |  |  |  |
|  | Morgan | 33,875 |  | 41,500 |  |  |  |  |
|  | Shelby | 34,093 |  | 37,200 |  |  |  |  |
| 26 | Marion | 697,567 | 697,567 | 762,000 | 762,000 | 15 | 46,504 | 50,800 |
| 27 | Hancock | 26,665 | 47,058 | 32,800 | 53,500 | 1 | 47,058 | 53,500 |
|  | Rush | 20,393 |  | 20,700 |  |  |  |  |
| 28 | Fayette | 24,454 | 47,926 | 25,400 | 49,400 | 1 | 47,926 | 49,400 |
|  | Franklin | 17,015 |  | 17,000 |  |  |  |  |
|  | Union | 6,457 |  | 7,000 |  |  |  |  |
| 29 | Bartholomew | 48,198 | 98,763 | 56,900 | 112,600 | 2 | 49,382 | 56,300 |
|  | Decatur | 20,019 |  | 22,600 |  |  |  |  |
|  | Jackson | 30,556 |  | 33,100 |  |  |  |  |
| 30 | Brown | 7,024 | 102,813 | 8,000 | 117,800 | 2 | 51,407 | 58,900 |
|  | Lawrence | 36,564 |  | 37,700 |  |  |  |  |
|  | Monroe | 59,225 |  | 72,100 |  |  |  |  |
| 31 | Daviess | 26,636 | 91,848 | 27,300 | 94,300 | 2 | 45,924 | 47,150 |
|  | Greene | 26,327 |  | 26,600 |  |  |  |  |
|  | Martin | 10,608 |  | 11,000 |  |  |  |  |
|  | Orange | 16,877 |  | 17,000 |  |  |  |  |
|  | Owen | 11,400 |  | 12,400 |  |  |  |  |
| 32 | Dearborn | 28,674 | 84,633 | 30,000 | 87,900 | 2 | 42,317 | 43,950 |
|  | Jefferson | 24,061 |  | 25,200 |  |  |  |  |
|  | Ohio | 4,165 |  | 3,900 |  |  |  |  |
|  | Ripley | 20,641 |  | 22,500 |  |  |  |  |
|  | Switzerland | 7,092 |  | 6,300 |  |  |  |  |
| 33 | Clark | 66,453 | 98,363 | 68,200 | 104,100 | 2 | 49,182 | 52,050 |
|  | Jennings | 17,267 |  | 19,600 |  |  |  |  |
|  | Scott | 14,643 |  | 16,300 |  |  |  |  |
| 34 | Crawford | 8,379 | 45,405 | 8,500 | 47,900 | 1 | 45,405 | 47,900 |
|  | Harrison | 19,207 |  | 19,700 |  |  |  |  |
|  | Washington | 17,819 |  | 19,700 |  |  |  |  |
| 35 | Floyd | 53,003 | 53,003 | 53,900 | 53,900 | 1 | 53,003 | 53,900 |
| 36 | Knox | 41,561 | 41,561 | 41,300 | 41,300 | 1 | 41,561 | 41,300 |
| 37 | Dubois | 27,463 | 97,143 | 30,200 | 103,600 | 2 | 48,572 | 51,800 |
|  | Perry | 17,232 |  | 19,000 |  |  |  |  |
|  | Pike | 12,797 |  | 12,200 |  |  |  |  |
|  | Spencer | 16,074 |  | 16,700 |  |  |  |  |
|  | Warrick | 23,577 |  | 25,500 |  |  |  |  |
| 38 | Gibson | 29,949 | 49,153 | 29,400 | 50,500 | 1 | 49,153 | 50,500 |
|  | Posey | 19,214 |  | 21,100 |  |  |  |  |
| 39 | Vanderburgh | 165,794 | 165,794 | 168,300 | 168,300 | 4 | 41,449 | 42,075 |
| State Totals |  | 4662,498 | 4662,498 | 5049,000 | 5049,000 | 100 | *46,625 | *50,490 |

* Average = Ideal District

Sources: Apportionment and districting according to Burns, Ind. Stat. §34-102 (1965, Supp. 1968).
1967 county population estimates based on DX J pp. 20-22.
All calculations made by the Court.

APPENDIX. D

REPRESENTATION CHARACTERISTICS
OF
HOUSE  DISTRICTS

| District | District Population as Percentage of Ideal District | | Degree of Over- or Underrepresentation (Variation from Ideal) | |
|---|---|---|---|---|
| | 1960 | 1967 | 1960 | 1967 |
| 1 | 100.077 | 96.564 | - 0.077% | + 3.436% |
| 2 | 98.614 | 113.488 | + 1.386% | -13.488% |
| 3 | 100.924 | 105.169 | - 0.924% | - 5.169% |
| 4 | 102.368 | 99.703 | - 2.368% | + 0.297% |
| 5 | 108.905 | 111.771 | - 8.905% | -11.771% |
| 6 | 97.491 | 97.445 | + 2.509% | + 2.555% |
| 7 | 91.524 | 88.136 | + 8.476% | +11.864% |
| 8 | 107.998 | 105.565 | - 7.998% | - 5.565% |
| 9 | 103.451 | 102.925 | - 3.451% | - 2.925% |
| 10 | 99.601 | 104.258 | + 0.399% | - 4.258% |
| 11 | 98.366 | 99.228 | + 1.634% | + 0.772% |
| 12 | 102.805 | 100.713 | - 2.805% | - 0.713% |
| 13 | 96.373 | 88.136 | + 3.627% | +11.864% |
| 14 | 95.573 | 97.049 | + 4.427% | + 2.951% |
| 15 | 99.030 | 95.464 | + 0.970% | + 4.536% |
| 16 | 105.566 | 108.437 | - 5.566% | - 8.437% |
| 17 | 91.540 | 97.148 | + 8.460% | + 2.852% |
| 18 | 97.087 | 95.464 | + 2.913% | + 4.536% |
| 19 | 89.947 | 90.051 | +10.053% | + 9.949% |
| 20 | 95.449 | 97.114 | + 4.551% | + 2.886% |
| 21 | 104.877 | 104.575 | - 4.877% | - 4.575% |
| 22 | 109.892 | 111.210 | - 9.892% | -11.210% |
| 23 | 93.068 | 86.552 | + 6.932% | +13.448% |
| 24 | 105.381 | 101.208 | - 5.381% | - 1.208% |
| 25 | 109.081 | 119.099 | - 9.081% | -19.099% |
| 26 | 99.740 | 100.614 | + 0.260% | - 0.614% |
| 27 | 100.929 | 105.962 | - 0.929% | - 5.962% |
| 28 | 102.790 | 97.841 | - 2.790% | + 2.159% |
| 29 | 105.922 | 111.507 | - 5.922% | -11.507% |
| 30 | 110.254 | 116.657 | -10.254% | -16.657% |
| 31 | 98.497 | 93.385 | + 1.503% | + 6.615% |
| 32 | 90.760 | 87.047 | + 9.240% | +12.953% |
| 33 | 105.484 | 103.090 | - 5.484% | - 3.090% |
| 34 | 97.383 | 94.870 | + 2.617% | + 5.130% |
| 35 | 113.679 | 106.754 | -13.679% | - 6.754% |
| 36 | 89.139 | 81.798 | +10.861% | +18.202% |
| 37 | 104.176 | 102.595 | - 4.176% | - 2.595% |
| 38 | 105.422 | 100.020 | - 5.422% | - 0.020% |
| 39 | 88.899 | 83.333 | +11.101% | +16.677% |

SUMMARY

|  | 1960 | 1967 |
|---|---|---|
| Range of Variation | 24.780% | 37.301% |
| Ratio of Largest to Smallest District | 1.279 | 1.456 |
| Mean Variation | 5.177% | 6.905% |
| Districts Varying by More Than ±5.000% | 18/39 | 20/39 |
| Districts Varying by More Than ±1.000% | 33/39 | 34/39 |

Source: Calculations made by Court from Appendix C.

───◆───

## ORDER

The above-entitled cause came before the three-judge court for trial on the plaintiffs' complaint, the defendant's answer, and the complaint of intervention and answer of intervenors. The Court having heard and considered the evidence and the oral arguments of counsel, and having considered the briefs of the parties, now files simultaneously with this Order its written Opinion in which the Court's findings of fact and conclusions of law appear.

▆▆▆ From the evidence and the law, the Court finds and concludes that the multi-member districting provisions of the present legislative apportionment statutes of Indiana, Indiana Acts of 1965 (2d Spec.Sess.), ch. 5, sec. 3 and ch. 4, sec. 3 (Ind.Ann.Stat. §§ 34–102, 34–104 (Burns' Supp.1968)), as they relate to Marion County, operate to minimize and cancel out the voting strength of a cognizable racial minority group residing in the Center Township Ghetto, as such ghetto is defined and delineated in the Court's written Opinion, to the extent that the members of such minority group are deprived of equal protection of the laws under the Fourteenth Amendment of the Constitution of the United States.

Under the evidence before the Court such invidious effects will continue so long as Marion County is apportioned into large senate and house multi-member districts. Hence, those portions of the present legislative apportionment statutes relating to Marion County, as to both the Senate and the House of the General Assembly, are unconstitutional and void. The Court finds that the only practicable remedy for such unconstitutional deprivation of voting strength is the elimination of the large multi-member house and senate districts in Marion County.

From the evidence adduced in this case, to redistrict Marion County alone, to provide single-member districts or any other type of districts meeting constitutional standards, would leave impermissible population variations between the new Marion County districts and other districts in the State.

Independent of the impermissible population variations that would exist between new Marion County districts and other districts in the State, impermissible population variations would remain between existing districts in the State when compared among themselves. Therefore, a redistricting of the entire

State as to both houses of the General Assembly is necessitated.

While recognizing the right of the injured plaintiffs to have their constitutional rights vindicated at the earliest practicable time, the Court must also recognize that the federal judiciary functions within a system of federalism which entrusts the responsibility of legislative apportionment and redistricting primarily to the state legislature. The Court must therefore afford Governor Edgar D. Whitcomb a reasonable opportunity to call a Special Session of the General Assembly of the State of Indiana so that it may enact legislation to redistrict the State of Indiana and reapportion the legislative seats in the General Assembly in accordance with federal constitutional requirements and in compliance with this Court's opinion.

An injunction will not issue at this time and the State will be given until October 1, 1969, to enact statutes redistricting the State and reapportioning the legislative seats in the General Assembly to remedy the improper districting and malapportionment found to exist as pointed out in the Court's opinion.

This cutoff date is one by which there would have to be filed with the Court an enactment approved by both houses of the Indiana General Assembly and signed into law by the Governor.

The Court will retain jurisdiction in these proceedings pending the period granted the State within which to act and for such additional time as may be necessary to effectuate an adequate remedy to those to whom relief is due. Because of the relative proximity in time of the initial filing date for candidates for the next primary election for members of the Indiana General Assembly [February 24, 1970], no final judgment will issue without an adequate apportionment plan being approved and/or promulgated therein.

It is so ordered.